Not for Publication

**United States District Court**
**for the District of New Jersey**

| | |
|---|---|
| SARAH MAZZARINO as co-executor of the ESTATE OF JEANNIE R. TOOLE,<br><br>     *Plaintiff*,<br><br> v.<br><br>THE PRUDENTIAL INSURANCE COMPANY OF AMERICA and THE DELTA AIRLINES ACCIDENTAL DEATH AND DISMEMBERMENT PLAN,<br><br>    *Defendants*. | Civil No.: 13-4702 (KSH)<br><br><br><br>    **Opinion** |

**<u>Katharine S. Hayden, U.S.D.J.</u>**

Sarah Mazzarino, as co-executor of the estate of her mother Jeannie R. Toole, filed suit against The Prudential Insurance Company of America ("Prudential") and The Delta Airlines Accidental Death and Dismemberment Plan[1] for unpaid insurance benefits and ERISA statutory penalties. Before the Court is defendants' motion for summary judgment, which seeks dismissal of the complaint in its entirety. Defendants argue that Mazzarino's claim for coverage is barred by the insurance policy's exclusion regarding sickness and medical treatment, and that statutory penalties are otherwise inapplicable. For the reasons that follow, defendants' motion is granted.

## I. <u>Background</u>

### 1. **Death of the Insured**

The facts and supporting documents referred to below are taken from the administrative record ("AR"), which was filed in due course in this litigation. *See* D.E. 29-13 to 29-25, described

---

[1] In their answer, filed April 3, 2013, defendants indicate that Mazzarino misidentified the insurance plan in her complaint. The correct plan name is "The Delta Airlines, Inc. Optional Insurance Plan." [D.E. 3]

as the "authentic copy of the entire claim file concerning Sarah Mazzarino's … claim for accidental death and dismemberment benefits."  This exhibit is comprised of documents with a bates range of PRU 77212-000172-000149 through PRU 77212-000172-002010. [2]

As of March 2011, Jeannie Toole was being treated by her physician, Dr. Clyde Bench, for neck and lower back pain due to cervical spondylosis and lumbosacral disk disease.  For these conditions she was prescribed Lortab, a prescription strength medication that contains acetaminophen, the active analgesic ingredient in Tylenol.  In March 2011, and as early as January 2010, Toole was taking this medication approximately four times per day—the dosage contained 10mg of Hydrocodone and 500mg of acetaminophen.

On or around March 1, 2011, Toole told her children that she was suffering from flu-like symptoms, for which she began taking over-the-counter Tylenol.  By March 3 her condition worsened drastically—Toole called Sarah Mazzarino and told her that she was very sick and needed assistance.  She was taken to the emergency department at St. Mark's Hospital, where she was treated by Dr. Matthew Broadwater-Hollifield, who wrote as follows in his clinical report dated March 3, 2011:  "Chief Complaint – DRUG OVERDOSE.  This occurred several days ago.  Toxic symptoms present in [emergency department] with drowsiness."  (AR 1059.)  He noted further that Toole's family "called 911 [on March 3] because the patient has been lethargic, not getting out of bed for three or four days.  They were concerned she was taking too much of her medications.  The patient denies suicidal intent.  There were multiple bottles of Lortab found at the scene that were empty.  One was filled 1/16 and one filled 2/8, both with 150 or more tablets,

---

[2]      The facts pertinent to this litigation, including Toole's residence and place of medical treatment, all occurred in the state of Utah.  This action was first filed in the United States District Court for the District of Columbia, based in part on plaintiff's belief that the defendants were doing business in that district.  Defendants denied that allegation and successfully moved to transfer venue to the District of New Jersey.

both intended to last one month."[3]   (AR 1059.)   In documenting Toole's course of care, Dr. Broadwater-Hollifield noted that he was "highly suspicious of Tylenol toxicity due to subacute overdose" as a result of Toole's "heavy prescription drug use from multiple providers." (AR 1063.) Dr. Broadwater-Hollifield then concluded that the seriousness of her condition warranted treatment in the intensive care unit, and she was transferred to Intermountain Medical Center ("IMC").   (AR 1063.)   Dr. Broadwater-Hollifield's clinical impression upon her transfer made reference to "[p]robable overdose (Tylenol)."   (AR 1063.)

Toole presented at IMC on March 3 awake but disoriented.   Her acetaminophen level prior to admission was "lower than expected, but consistent with chronic acetaminophen ingestion." (AR 422.)   Her condition failed to improve and, on March 8, she died.   The cause of death was listed as "brain edema [d]ue to (or as a consequence of) liver failure, [d]ue to (or as a consequence of) Tylenol overdose."   (AR 332.)   The death certificate identified the method of "injury" as "Unintentional Tylenol overdose."   (AR 332.)   In a discharge summary a resident physician at IMC noted that "it sounds as though she [had] been increasing her Lortab use over the last several days."   (AR 422.)

### 2.   The Accidental Death Insurance Plan

At the time of her death, Toole worked for Delta Airlines and participated in the accidental death insurance plan that Delta offered, Group Policy G-50002.   The plan's coverage "pays benefits for accidental Loss which results from a Covered Accident," where "Loss" means "the

---

[3]      Mazzarino disputes that the Lortab bottle was empty, and maintains that thirty pills remained in the "Hydrocodone" bottle that was last refilled on February 8, 2011.  (Mazzarino Supp. Statement of Facts ¶ 22). Mazzarino also indicates that the bottle "prescribed 4-6 pills per day."   The Court recognizes a discrepancy between this statement and Dr. Broadwater-Hollifield's medical records, but finds it immaterial for the purposes of this analysis.  Because the bottle was intended to last one month, and because there were thirty pills remaining for a period of at least five days, Mazzarino's submission suggests only that Toole was taking her Lortab medication as prescribed—a fact not in dispute here.

person's … loss of life." (Denitzio Dec., Ex. 3 at 15.)  Excluded from coverage, however, is any loss arising out of sickness or treatment of that sickness, as each is defined under the policy. Specifically, the plan's certificate provides that "[a] loss is not covered if it results from … Sickness, whether the Loss results directly or indirectly from the Sickness … [or] [m]edical or surgical treatment of Sickness, whether the Loss results directly or indirectly from the treatment." (Denitzio Dec., Ex. 3 at 17.)  The certificate defines "Sickness" as "[a]ny disorder of the body or mind of a Covered Person, but not an Injury." (Denitzio Dec., Ex. 3 at 33.)  Toole was survived by six children, including Sarah Mazzarino, each of whom filed claims as beneficiaries for coverage arising out of Toole's death.  (AR 309-26.)

### 3.  Prudential's Claim Adjudication

As claims administrator, Prudential was charged with determining eligibility for, and the amount of, any benefits payable under the policy.  (Zonakis Dec., Ex. 1 at 6-7.)  In reviewing the claim here, Prudential's Medical Director, Dr. Albert A. Kowalski, considered the following documents: claims forms submitted by Delta; Toole's death certificate, issued by the State of Utah; the insurance policy at issue; pharmacy records from the Intermountain pharmacy; medical records from IMC; medical records from Toole's physician, Dr. Clyde Bench; a list of medical providers submitted by Toole's family; and a review of medical information by Prudential's Medical Director.  (AR 245.)  On the basis of Dr. Kowalski's review and conclusions, Prudential denied the beneficiaries' claim for coverage under the sickness and medical treatment exclusion.

Prudential noted in its claim denial that Toole was "taken to the emergency room and admitted to the hospital with fulminant hepatic liver failure and kidney failure as a consequence of acetaminophen overdose."  (AR 246.)  This unintentional overdose, Prudential concluded, was caused *indirectly* by "sickness" as it is defined under the policy—cervical spondylosis and

4

lumbosacral disk disease—and *directly* by Toole's treatment of that sickness—Lortab, as prescribed, and over the counter Tylenol, which "was being self administered as treatment for pain." (AR 246).

Mazzarino appealed that determination through counsel on October 19, 2011, submitting statements from Toole's family regarding her Tylenol usage (AR 462); additional medical and prescription records; questionnaire responses from Dr. Bench, in which he noted that "[t]here was no indication that [Toole] was not taking her medication as prescribed" and that "the medication dosage if taken as prescribed ... would not have resulted in an overdose" (AR 482); medical literature regarding accidental Tylenol overdose (AR 455.); and legal argument regarding the beneficiaries' entitlement to coverage under Toole's policy. (AR 462.) Dr. Kowalski reviewed the updated materials, but concluded that there was "no pertinent additional medical information in the supplemental information received to change [his] original medical opinions." Dr. Kowalski reiterated his opinion that the "records support that the insured's loss of life resulted directly from the injury (Unintentional Tylenol Overdose) sustained on 03/03/11 and from no other cause." (AR. 156.)

Prudential then referred the claim to an appeals panel, which reviewed the materials presented by the beneficiaries' counsel, the updated opinion of Dr. Kowalski, and many of the same medical and pharmaceutical records considered in connection with the initial claim denial. After a "thorough evaluation of the documentation in the claim file and the documentation received for the purpose of the appeal," the appeals panel upheld Prudential's initial determination because, in its view, the documentation "[did] not supply any medical evidence or provide any legal reasoning to support a reversal of the claim denial." (AR 1829.) In reaching this conclusion, Prudential reiterated that, "[s]ince a significant source of the acetaminophen was the Lortab and

the Lortab was treating Ms. Toole's cervical spondylosis and lumbosacral disk disease, it was our medical consultant's opinion that the direct cause of Ms. Toole's death was the treatment for her sickness and the indirect cause of death was the sickness being treated."  (AR 1828.)

In a letter dated March 15, 2012, the beneficiaries appealed Prudential's claim denial for the second time—supported by a report from Dr. Nicholas T. Lappas, a forensic toxicologist.  The report noted that the acetaminophen concentration reported by St. Mark's Hospital was for the generic drug acetaminophen, and not for any specific formulation or product containing that drug, like Lortab.  Because there was "no analysis conducted that would allow a conclusion to be drawn as to the source of the acetaminophen detected," Dr. Lappas found that "Dr. Kowalski's opinion that Lortab was a '… significant source of the acetaminophen' [was] not consistent with and [could not] be determined from the analytical results."  (AR 1860.)

Prudential presented the Lappas report and Toole's pertinent medical records to Dr. James Hillman, Board Certified in Medical Toxicology, for an external file review.  In a report dated May 14, 2012, Dr. Hillman first noted that Toole's acetaminophen level, 4.8 micrograms/mL, was "barely within the therapeutic range."  (AR 1871.)  He explained, however, that the "other laboratory findings as well as the clinical signs and symptoms documented in the medical record from Intermountain Medical Center are otherwise consistent with the liver diseases and resultant liver failure that is seen in overdose toxicity acetaminophen."  (AR 1872.)  Dr. Hillman then identified and considered two scenarios that might reconcile "these seemingly discordant" pieces of information:

> The first possibility is the liver toxicity was secondary to an acute
> indigestion [sic] that occurred at least 24 hours, or even more likely,
> 48 hours prior to presentation to St. Mark's Hospital.  In the medical
> records available to me there is no clear documentation of an acute

6

> intentional single dose of acetaminophen ingested by the decedent for the purpose of self harm.
>
> The other possibility would include the chronic, that is the repetitive, ingestion of excessive doses of acetaminophen over several days or more. This last scenario would strongly suggest that the decedent was consuming the prescribed Lortab preparation for its indicated use while additionally and probably inadvertently consuming over-the-counter acetaminophen for her perceived symptoms. She probably did not realize and was unaware that both the Lortab and the over-the-counter acetaminophen preparation were resulting in an excessive and toxic dose of the drug acetaminophen.

(AR 1872.) While noting that "[t]hat the acetaminophen available in Lortab would not have been of sufficient quantity of itself to cause liver toxicity," Dr. Hillman found it "possible that the acetaminophen in Lortab could have been an adjutant source of acetaminophen if simultaneously consumed with additional over-the-counter acetaminophen product then together would have resulted in a sufficient quantity of acetaminophen to result in liver toxicity and death." (AR 1872.) Dr. Hillman thus concluded that "[i]n all probability based on the medical records provided [to him], the decedent died as a result of liver failure secondary to acetaminophen toxicity." (AR 1871.)

Following a review of the claim file, including the Lappas and Hillman reports, the second appeals panel noted that "the insured was taking Lortab for sickness, which contains acetaminophen, as well as over-the-counter Tylenol, which also is acetaminophen" and concluded that "the combination of the both is what led to the liver failure." (AR 151.) In a letter dated June 28, 2012, Prudential informed the beneficiaries that, after "review of the claim, medical records, and all available medical opinions, it [] determined that Ms. Toole's death was an accident resulting indirectly from sickness (Cervical Spondylosis; Lumbosacral Disk Disease, and influenza) and directly from medical treatment (Lortab and over-the-counter acetaminophen

(Tylenol)) of that sickness."   (AR 1889.)   On that basis, Prudential upheld its denial of the beneficiaries' claim.

### 4.  Litigation History

Mazzarino, as co-executor of Toole's estate, sued Prudential in a federal lawsuit she filed in the District of Columbia.  In her three-count complaint, she challenged Prudential's denial of coverage under 29 U.S.C. §§ 502(a)(1)(B) and (a)(3), and asserted a claim for statutory penalties regarding Prudential's failure to provide certain information regarding the insurance plan and its claims file documentation. Defendants filed an answer substantially denying the allegations, and successfully moved to transfer venue to the District of New Jersey.

Defendants now move for summary judgment, seeking dismissal of the action in its entirety.  They argue for the application of a deferential standard of review, based upon Prudential's discretion under the policy, and submit that Mazzarino's claims for statutory penalties should be dismissed because her lawsuit failed to name the plan administrator as a defendant.

### 5.  ERISA Standard of Review Under 29 U.S.C. 1132(a)(1)(B)

Congress enacted the Employee Retirement Income Security Act of 1974 ("ERISA"), in order to protect the interests of participants of employee benefit plans by establishing standards of conduct and disclosure requirements for fiduciaries of employee benefit plans "and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b). Mazzarino brings her claim for insurance benefits under section 502(a)(1)(B) of ERISA, which provides that "[a] civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. 1132(a)(1)(B).  In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the Supreme Court held that, when evaluating

8

challenges to denials of benefits under this subsection, district courts are to review the administrator's decision under a *de novo* standard, unless the plan grants that entity discretionary authority to determine eligibility for benefits or to interpret the terms of the plan.  Where the benefit plan gives the administrator discretion, the denial of ERISA benefits is considered under an arbitrary and capricious standard.  *Id.* at 115.

Prudential argues that it has been vested with such discretion, and points to two documents in support.  First, a document titled "Delta Airlines, Inc. Optional Insurance Plan," which Prudential refers to as the "plan document," delegated to Prudential the "full power to interpret and apply the terms of the Plan as they relate to the benefits provided under the [accidental death insurance plan]." (Zonakis Dec., Ex. 1 at Art. 6.)  Second, Prudential cites the policy's Summary Plan Description ("SPD"), titled "Delta AD&D Insurance Benefit Handbook," which provides that, as claims administrator, Prudential "serves as the final reviewer under the Plan and has sole and complete discretionary authority to determine conclusively any and all questions concerning the administration and interpretation of the Plan, including questions concerning eligibility to participate in the Plan; eligibility for benefits; the relevant facts; the amount and type of benefits payable to any … Beneficiary; and the construction of all terms of the plan." (Zonakis Dec., Ex. 3 at 48.)  The SPD also provides that "[d]ecisions by [Prudential] will be final, conclusive and binding on all parties claiming to have an interest in the Plan and are not subject to further review by Delta.  Benefits are paid under the Plan only if [Prudential] or the Plan Administrator decides, in its sole authority, that the participant or other claimant is entitled to them." (Zonakis Dec., Ex. 3 at 48.)

Prudential's showing does not, however, end the inquiry.  Mazzarino argues that, while reference may be made to Prudential's "complete discretionary authority" in the SPD and "full

power" of interpretation under the plan document, no *operative* plan document extends such authority.  Specifically, she points to language in both the plan document and the SPD that, she maintains, limits this Court's focus to other documents—namely, the insurance contract and certificate of insurance.  The plan document states (1) that "[t]he terms and conditions of coverage under a Benefit Program are set forth in a separate Insurance Contract and the benefits shall be determined solely therefrom" (Zonakis Dec., Ex. 1 at Art. 2.2); and (2) that "The Delta Airlines, Inc. Optional Insurance Plan … is comprised of an Insurance Contract pursuant to which optional and dependent life and accident insurance benefits are provided to eligible Participants." (Zonakis Dec., Ex. 1 at Art. 1.)  The SPD adds further that the "provisions of the Plan are defined in its official Plan documents, which govern the terms and operation of the Plan.  These documents include the certificates of coverage and group insurance policies issued by Prudential …. If there is a conflict between the information in this handbook and the Plan documents, the Plan documents will govern."  (Zonakis Dec., Ex. 3 at 1.)

Mazzarino argues that because the insurance contract is silent on the issue of discretion, the SPD's grant is ineffective.  She argues further that this issue is controlled by the Supreme Court's decision in *Cigna v. Amara*, __ U.S. __, 131 S.Ct. 1866 (2011), in which the Court found that summary plan descriptions "provide communications with beneficiaries *about* the plan, but [] their statements do not themselves constitute *terms* of the plan."  *Amara*, 131 S.Ct. at 1878 (emphasis in original.)

*Amara* does not fully resolve the instant dispute.  While that case certainly disturbed the common belief that, at least in some capacity, a summary plan description was one of "the documents and instruments governing the plan," *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 304 (2009), it left open certain issues regarding the SPD's role in judicial

review of a benefits determination. As the Tenth Circuit observed, *Amara* could be interpreted as "presenting either of two fairly simple propositions, given the factual context of that case: (1) the terms of the SPD are not enforceable when they conflict with governing plan documents, or (2) the SPD cannot create terms that are not also authorized by, or reflected in, governing plan documents." *Eugene v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 113 (10th Cir. 2011). The Supreme Court's decision in *Amara* could thus be interpreted to view the SPD as "a document or instrument *governing* the plan without constituting the *terms* of that plan." *Liss v. Fidelity Employer Services Co., LLC*, 516 F. App'x 468, 474 (6th Cir. 2013) (emphasis supplied).

The Third Circuit has yet to consider the issue on facts similar to those in dispute here, but this Court need not choose sides now. While it might appear that the language in the SPD is insufficient to grant discretion where no other document so provides, for the reasons below, under either standard of review Prudential's denial of coverage was reasonable and correct.

## II. <u>Analysis</u>

### 1. **Claim for Benefits Under 29 U.S.C. 1132(a)(1)(B)**

Prudential determined that Toole died of an accidental acetaminophen overdose, which, it found, was caused by her ingestion of Lortab and Tylenol. Because Toole was taking Lortab to treat her cervical spondylosis and lumbosacral disk disease, Prudential reasoned that the claim should be denied under the policy's exclusion for losses caused by sickness or treatment of that sickness.

As a threshold matter, Mazzarino does not challenge Prudential's initial determination that Toole's cervical spondylosis and lumbosacral disk disease constitute "sickness" under the plan. The breadth of the definition in the plan's certificate is significant. "Sickness" is "*[a]ny disorder of the body* or mind of a Covered Person, but not an Injury." (Denitzio Dec., Ex. 3 at 33) (emphasis

11

supplied). Also, it is undisputed that Toole died of accidental acetaminophen overdose. She was hospitalized in part because of her family's concern that she was inadvertently "taking too much of her medications." (AR 1059.) These medications included prescription strength Lortab and over the counter Tylenol, both of which contained differing amounts of acetaminophen. The emergency room physician treating Toole identified her "Chief Complaint" as "DRUG OVERDOSE" and noted that "[t]oxic symptoms [were] present in [emergency department] with drowsiness." (AR 1059.) When Toole was transferred to the intensive care unit at a second facility, the same physician indicated that he was "highly suspicious of Tylenol toxicity due to subacute overdose," and his clinical impression made reference to "[p]robable overdose (Tylenol)." (AR 1063.) Toole died five days later, with a cause of death listed as "brain edema [d]ue to (or as a consequence of) liver failure, [d]ue to (or as a consequence of) Tylenol overdose." (AR 332.) The death certificate identified the method of "injury" as "Unintentional Tylenol overdose." (AR 332.) Mazzarino presents no contrary evidence as to cause of, or condition precipitating, Toole's death.

Rather, her chief dispute concerns the extent to which Lortab *alone* caused the overdose. Mazzarino first points to the absence of increased hydrocodone levels as evidence that the loss here was not caused by "'medical treatment' in the form of prescribed Lortab." (Mazzarino Br. at 18.) Mazzarino argues that because Lortab also contains hydrocodone, and given defendants supposed suggestion that "Toole consumed at least a whole bottle" of Lortab, Toole would have exhibited high levels of the drug upon admission. On this point, however, Mazzarino misapprehends the basis for Prudential's findings. The AR establishes that Prudential never concluded (or suggested) that Toole committed suicide, let alone denied benefits on that ground. Instead, the record shows that Prudential denied the claim for coverage because it determined—in

12

agreement with the contemporaneous medical records—that Toole's acetaminophen overdose was caused by some combination of her ingestion of *both* Lortab *and* over the counter Tylenol for the purpose of treating her cervical spondylosis and lumbosacral disk disease and flu symptoms, respectively.  Because the plan here precludes coverage where the loss, i.e., the death, "results *directly or indirectly*" from sickness or treatment of that sickness, that finding was sufficient to deny coverage under the unambiguous language of this exclusion.

Mazzarino also suggests—again, based on the misguided belief that Toole's claim was treated as an apparent suicide—that the acetaminophen levels were too low to support a finding of loss by overdose.  (Mazzarino Br. at 19.)  But the evidence in the administrative record provides a clear and undisputed explanation for this alleged inconsistency.   While the physician at Intermountain Medical Center noted that Toole's acetaminophen level was "lower than expected," it was nonetheless "consistent with chronic acetaminophen ingestion."  (AR 422.)  At St. Mark's Hospital, Dr. Broadwater-Hollifield documented that Toole had "toxic symptoms" upon admission, but indicated that the overdose "occurred several days ago."  (AR 1059.)  According to Dr. Hillman—who conducted an external review of the claim—Toole "died as a result of liver failure secondary to acetaminophen toxicity."  (AR 1871.)  Dr. Hillman also explained the apparent discrepancy between his conclusion and the lower level of acetaminophen presented—that Toole likely was "consuming the prescribed Lortab preparation for its indicated use while additionally and probably inadvertently consuming over-the-counter acetaminophen for her perceived symptoms."  (AR 1872.)  This observation is supported by the administrative record and provides a sound basis for Prudential's determination.

Mazzarino relies on *Viera v. Life Ins. Co. of N. Am.*, 2012 WL 3194394 (E.D. Pa. 2012), which considered a claim for benefits following the insured's fatal motorcycle accident.  The

insurer denied coverage "on the ground that Viera's Coumadin treatment complicated his medical treatment and constituted a contributing factor to his death after his accident." *Id.* at *4. In conducting a *de novo* review, and in the face of two competing expert opinions, the court reversed the insurer's determination. The district court's reasoning demonstrates why *Viera* does not apply here: the court found that "[t]he contemporaneous medical records do not clearly indicate that the Coumadin contributed to Viera's death to the extent that his injuries would not have resulted in his death regardless of the Coumadin." *Id.* at *6. Consequently, in the absence of undisputed contemporaneous evidence—including in the postmortem report—and crediting one expert report over the other, the court determined that Viera's injuries "were so severe that [his] Coumadin did not cause or otherwise contribute to his death. He would have died from his injuries regardless of his Coumadin treatment." *Id.* at *6. Here, however, there is no dispute that Toole died of an accidental acetaminophen overdose, nor is there a dispute that she was taking Lortab—a medication that contains acetaminophen—as prescribed to treat her cervical spondylosis and lumbosacral disk disease. On those facts, Prudential concluded that the loss here was caused, at least indirectly, by Toole's treatment of a sickness.

The decision in *Ferguson v. United of Omaha*, 3 F.Supp.3d 474 (D. Md. 2014), on which Mazzarino also relies, is distinguishable as well. There the insured died from drowning and the court found that because there was no "direct evidence" that he had suffered a seizure while swimming, the administrator abused its discretion when applying an exclusion for deaths caused by or as a consequence of sickness. *Id.* at 482. Again, however, in this case the evidence more than suggests—if not definitively states—that Toole died as a result of an acetaminophen overdose and Mazzarino does not put this in dispute. Notwithstanding the notation that acetaminophen levels were "lower than expected" (AR 422), Dr. Hillman explained that "other laboratory findings

14

as well as the clinical signs and symptoms documented in the medical record from Intermountain Medical Center are otherwise consistent with the liver disease and resultant liver failure that is seen in overdose toxicity from acetaminophen." (AR 1871-72.)

After thorough consideration of the administrative record, the Court finds that Prudential's determination of Toole's claim should be upheld. *De novo* review reveals undisputed evidence in the AR to support the determination that the exclusion applies, and the documentary evidence is such that Prudential's conclusion was both reasonable and correct. Defendants motion for summary judgment therefore is granted as to this point, and Mazzarino's claim for benefits under section 502(1)(a)(B) of ERISA is dismissed.

### 2.   Claim for Relief Under 29 U.S.C. 1132(a)(3)

In addition to the claim for benefits under Section 502(a)(1)(B), Mazzarino also asserts a claim for relief under Section 502(a)(3). (Compl. ¶4 ("This is an action pursuant to 29 U.S.C. §§ 502(a)(1)(B) and (a)(3) to clarify a beneficiary's rights to past … benefits under the terms of the plan").) Section 502(a)(3) is a civil enforcement "catchall" that provides equitable relief only for injuries not remedied elsewhere in Section 502. *See Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996). In *Varity*, the Supreme Court stated that when fashioning "appropriate equitable relief" under Section 502(a)(3) courts "will keep in mind the special nature and purpose of employee benefit plans, and … where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief." *Id.* at 515 (quotations omitted).

Defendants argue that Mazzarino's claim under Section 502(a)(3) must, under *Varity*, be dismissed as duplicative of its claim for benefits under Section 502(a)(1)(B). *See Chang v. Life Ins. Co. of N. Am.,* 2008 WL 2478379, at *4 (D.N.J. Jun. 17, 2008) (Brown, C.J.) (dismissing 502(a)(3) claim as duplicative of 502(a)(1)(B) claim because the former "appears to be nothing

15

more than an attempt to couch the request for relief it had previously set forth [in the 502(a)(1)(B) count] in the language of equity.")  Because Mazzarino does not seek any equitable relief under Section 502(a)(3) in the requested relief section of her complaint, defendants submit that the complaint fails to provide any independent basis to support a claim under that subsection. Defendants argue further that "during litigation, [Mazzarino] offered no independent basis to support a separate 502(a)(3) claim."

Mazzarino failed to dispute this argument in opposition to defendants' motion for summary judgment, despite the fact that it was her burden to do so.  *See Curtis v. Treloar,* 1998 WL 1110448 (D.N.J. Aug. 27, 1998) (Cooper, J.) *aff'd,* 189 F.3d 463 (3d Cir. 1999) ("plaintiffs appear to have abandoned that claim, as they have failed to offer any argument or evidence on that claim in opposition to defendants' motion for summary judgment.")*; Freeman v. Middle Twp. Bd. Of Educ.,* 2012 WL 3715925, at *3-4 (D.N.J. Aug. 27, 2012) (Bumb, J.) ("In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him.  The onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.") (quotations omitted).  Accordingly, Mazzarino's claim under Section 502(a)(3) is dismissed.

### 3.  Claim for Statutory Penalties

Under ERISA § 502 (c)(1)(B), "[a]ny administrator who fails or refuses to comply with a request for any information … may, in the court's discretion, be personally liable … in the amount of up to $100 a day from the date of such failure or refusal."  29 U.S.C. § 1132(c)(1)(B).  The word "administrator" refers only to "(i) the person specifically so designated by the terms of the instrument under which the plan is operated; (ii) if an administrator is not so designated, the plan sponsor; or (iii) in the case of a plan for which an administrator is not designated and a plan sponsor

cannot be identified, such other person as the Secretary may by regulation prescribe."  29 U.S.C. § 1002(16)(A).  For the purposes of assessing statutory penalties under Section 502(c)(1), claims are proper only as against the plan administrator.  *See Mondry v. Am. Family Mut. Ins. Co.*, 557 F.3d 781, 794 (7th Cir. 2009) ("[L]iability under section 1132(c)(1) is confined to the plan administrator and [courts] have rejected the contention that other parties, including claims administrators, can be held liable for the failure to supply participants with the plan documents they seek."); *Campo v. Oxford Health Plans, Inc.*, 2007 WL 1827220, at *5 (D.N.J. Jun. 26, 2007) (Simandle, J.) ("Consequently, because it is not the Plan Administrator, Oxford cannot be liable under Section 502(c).").

The plan here states that "Plan Administrator means the Administrative Committee of Delta Airlines, Inc. which shall have the authority to administer the Plan as set forth herein." (Zonakis Dec., Ex. 1 at Art. 2.11.)  It provides further that "The Executive Vice President – Human Resources of [Delta Airlines, Inc.] shall appoint the Administrative Committee members and shall have the power of removal and substitution, and shall designate the Chairman of the Administrative Committee …. The Administrative Committee shall be the Named Fiduciary of the plan for the purposes of operation and administration of the Plan."  (Zonakis Dec., Ex. 1 at Art. 5.1.)

Mazzarino failed to name either Delta Airlines, Inc. or the Administrative Committee as defendants in this action, and her claim for penalties under Section 502(c) fails on that basis. Mazzarino attempts to dispute this by arguing that the complaint "makes clear that claims are being brought against Delta Airlines."  (Mazzarino Br. at 30.)  In support, she cites to a single paragraph

that reads "Defendant Delta Airlines, utilized [Prudential] as the claims administrator and insurer for the plan."[4]

This paragraph is insufficient to confer on Delta Airlines, Inc. the status of a defendant. But even if it were, the claim would still fail because ERISA statutory penalties lie only as against the plan administrator—here, the Administrative Committee.   In *Wargotz v. Net Jets, Inc.*, 2010 WL 1931247 (D.N.J. May 13, 2010) (Martini, J.), the insured brought suit for statutory penalties under Section 502(c)(1)(B) for the failure to produce certain plan documents.  The plan was offered by the insured's employer, Net Jets, Inc. and NJ Executive Services, Inc., and designated the "Administrative Committee of NetJets, Inc." as plan administrator.   Because the disclosure provision, "by its terms, applie[d] to plan administrators," the court dismissed the claim for statutory penalties as against Net Jets, Inc. and NJ Executive Services, Inc. *Id.* at *14.  *See also Van Hoey v. Baxter International, Inc.*, 1997 WL 665855, at *7 (N.D. Ill. Oct. 27, 1997) (granting summary judgment in favor of Baxter where complaint failed to name plan administrator, the "Administrative Committee," as a defendant).

Accordingly, Mazzarino's claim for statutory penalties based on the failure to disclose certain plan documents is dismissed.

## III.   Conclusion

For the foregoing reasons, defendants' motion for summary judgment is granted.  An appropriate order will be entered.

<table>
<tr><td></td><td>/s/ Katharine S. Hayden</td></tr>
<tr><td>Date: March 26, 2015</td><td>Katharine S. Hayden, U.S.D.J.</td></tr>
</table>

---

[4]      In their answer, defendants admit that "Prudential insured accidental death and dismemberment benefits under the Plan and served as the claims administrator," but denied the remaining allegations contained in that paragraph. [D.E. 3].  No corporate disclosure statement was filed by Delta Airlines, Inc., and no appearance has been entered on its behalf.

18